TINDER, Circuit Judge.
The collapse of investment manager Sentinel Management Group, Inc. in the summer of 2007 left its customers in a lurch. Instead of maintaining customer assets in segregated accounts as required by law, Sentinel had pledged hundreds of millions of dollars in customer assets to secure an overnight loan at the Bank of New York, now Bank of New York Mellon. This left the bank in a secured position on Sentinel’s $312 million loan but its customers out millions. After filing for bankruptcy, Sentinel’s liquidation trustee brought a variety of claims against the bank to dislodge its secured position. After extensive proceedings, including more than two weeks of trial over the course of more than a month, the district court rejected the claims. This appeal raises concerns about Sentinel’s business practices and the degree to which the bank knew about them, but based on the district court’s factual findings, we affirm.
I. Factual Background
The district court’s comprehensive factual findings following a seventeen-day bench trial, see Grede v. Bank of New York Mellon, 441 B.R. 864 (N.D.Ill.2010), serve as the basis of our discussion, see Fed. R. Civ. P. 52(a). These findings of fact “are entitled to great deference and shall not be set aside unless they are clear ly erroneous.” Gaffney v. Riverboat Servs. of Ind., Inc., 451 F.3d 424, 447 (7th Cir.2006). If we are presented with two ways of viewing the evidence, the district court’s choice “cannot be clearly erroneous.” Id. at 448 (quoting Carnes Co. v. Stone Creek Mech., Inc., 412 F.3d 845, 847 (7th Cir.2005)). Given that the essential issues in this appeal are whether Sentinel had actual intent to hinder, delay, or defraud and whether the bank’s conduct was sufficiently egregious, we take special note that in assessing witness credibility, a district court’s “credibility determination can virtually never amount to clear error.” Id. (quoting Carnes, 412 F.3d at 848).
Before filing for bankruptcy in August 2007, Sentinel was an investment manager that marketed itself to its customers as providing a safe place to put their excess capital, assuring solid short-term returns, but also promising ready access to the capital. Sentinel’s customers weren’t typical investors; most of them were futures commission merchants (FCMs), which operate in the commodity industry akin to *858 the securities industry’s broker-dealers. In Sentinel’s hands, FCMs’ client money could, in compliance with industry regulations governing such funds, earn a decent return while maintaining the liquidity FCMs need. “Sentinel has constructed a fail-safe system that virtually eliminates risk from short term investing,” proclaimed Sentinel’s website in 2004. To accept capital from its FCM customers, Sentinel had to register as a FCM, but it did not solicit or accept orders for futures contracts. Sentinel received a “no-action” letter from the Commodity Futures Trading Commission (CFTC) exempting it from certain requirements applicable to FCMs. But Sentinel represented that it would maintain customer funds in segregated accounts as the district court found Sentinel was required under the Commodity Exchange Act, 7 U.S.C. § 1 et seq. Maintaining segregation meant that at all times a customer’s accounts held assets equal to the amount Sentinel owed the customer and treated and dealt with the assets “as belonging to such customer.” 7 U.S.C. § 6d(a)(2) (“Such money, securities, and property shall be separately accounted for and shall not be commingled with the funds of such commission merchant or be used to margin or guarantee the trades or contracts, or to secure or extend the credit, of any customer or person other than the one for whom the same are held.... ”). Maintaining segregation serves as commodity customers’ primary legal protection against wrongdoing or insolvency by FCMs and their depositories as contrasted to depositors’ Federal Deposit Insurance Corporation protection, see 12 U.S.C. § 1811 et seq., or securities investors’ Securities Investor Protection Corporation protection, see 15 U.S.C. § 78aaa, et seq. Sentinel also served other investors such as hedge funds and commodity pools and starting as early as 2005, maintained a house account for its own trading activity to benefit Sentinel insiders. In 2006, Sentinel represented that non-FCM entities made up about one-third of its customer base. By 2007, Sentinel held about $1.5 billion in customer assets but maintained only $3 million or less in net capital.
Sentinel pooled customer assets in various portfolios depending on whether the customer assets were CFTC-regulated assets of FCMs or unregulated funds such as hedge funds or FCMs’ proprietary funds. But Sentinel handled “its and its customers’ assets as a single, undifferentiated pool of cash and securities.” Grede, 441 B.R. at 874. When customers wanted their capital back, Sentinel could sell securities or borrow the money. Sentinel’s borrowing practices, and in particular an overnight loan it maintained with the Bank of New York, is this appeal’s focal point. This arrangement allowed Sentinel to borrow large amounts of cash while pledging customers’ securities as collateral.
Sentinel’s relationship with the bank began in 1997 in the institutional custody division but within months moved to the clearing division (technically dubbed broker dealer services) because Sentinel actively traded securities and frequently financed transaction settlements. Under the old arrangement, for each segregated account, Sentinel had a cash account for customer deposits and withdrawals. Assets couldn’t leave segregation without a corresponding transfer from a cash account. But the risks of overdrafts prompted a switch to an environment where securities would be bought and sold from clearing accounts lienable by the bank. In an email, one bank official said in reference to Sentinel’s original arrangement that “THIS ACCOUNT IS AN ACCIDENT WAITING TO HAPPEN.... I AM NOTIFYING YOU THAT I NO LONGER FEEL COMFORTABLE CLEARING THESE TRANSACTIONS AND REQUEST AN IMMEDIATE RE *859 SPONSE FROM YOU. THANK YOU.” TTX 18.1 (emphasis in original).
Under the new arrangement, Sentinel maintained three types of accounts at the bank. Clearing accounts allowed Sentinel to buy or sell securities, including government, corporate, and foreign securities and securities traded with physical certificates. The bank maintained the right to place a lien on the assets in clearing accounts. Second, Sentinel maintained an overnight loan account in conjunction with its secured line of credit. To borrow on the line of credit, Sentinel would call bank officials to confirm whether it had sufficient assets in lienable accounts to serve as collateral. A senior bank executive had to approve requests that put the line of credit above a predetermined “guidance line.” Third, Sentinel maintained segregated accounts that held assets that could not be subject to any bank lien. These included accounts (corresponding with the lienable clearing accounts) for government, corporate, and foreign securities but no corresponding segregated account for physical securities. To receive FCM funds in the segregated accounts, the bank countersigned letters acknowledging that the funds belonged to the customers and that the accounts would “not be subject to your lien or offset for, and on account of, any indebtedness now or hereafter owing us to you....” The agreement between Sentinel and the bank provided that the “Bank will not have, and will not assert, any claim or lien against Securities held in a Segregated Account nor will Bank grant any third party ... any interest in such Securities.”
Sentinel could independently transfer assets between accounts by issuing electronic desegregation instructions without significant bank knowledge or involvement. This system allowed for hundreds of thousands of trades worth trillions of dollars every day at the bank. Sentinel maintained responsibility for keeping assets at appropriate levels of segregation. The bank’s main concern was ensuring Sentinel had sufficient collateral in the lienable accounts to keep its overnight loan secured. In fact, at no point does it appear that the bank was under-secured. If Sentinel sought to extend the line of credit beyond the value of the assets held in the lienable accounts, the bank made sure Sentinel moved enough collateral into the lienable accounts. Sentinel used cash from the overnight loan for customer redemptions or failed trades and provided collateral in the form of the customers’ redeemed securities. When customers redeemed investments, Sentinel could provide cash, via the loan, without waiting for the securities to sell. This arrangement did not violate segregation requirements. When a customer cashed out, the amount needed in segregation dropped by the amount lent by the bank via the line of credit. The line of credit was in turn secured by assets moved out of customers’ segregated accounts and into clearing accounts.
But in 2001, and increasingly in 2004, Sentinel started using the loan to fund its own proprietary repurchase arrangements with counterparties such as FIMAT USA and Cantor Fitzgerald & Co. Sentinel would finance most of a security’s purchase price by transferring ownership of the security to a counterparty who would lend Sentinel an amount of cash equal to a percent of the asset’s market value. Sentinel used the overnight loan to cover the difference (known as a “haircut”) between the security’s cost and the repo loan. Sentinel had to buy the security back at some point for the amount loaned plus interest. By 2007, Sentinel held more than $2 billion in securities through repo arrangements. Meanwhile, Sentinel’s guidance line for the bank loan grew from $30 million pre-May 2004, to $55 million in May 2004, to $95 million in December 2004, to $175 million in June 2005, to $300 million in September *860 2006. The average loan balance from June 1, 2007, to August 13, 2007, was $369 million. The line topped out at $573 million at one point while all along customer assets served as collateral. In 2004, Sentinel faced a segregation shortfall of about $150 million, and by July 2007, that figure reached nearly $1 billion.
During the summer of 2007, the cloud of a liquidity and credit crunch settled in. Repurchase lenders became nervous. The type of securities Sentinel held became a focus of the market as counterparties stopped accepting securities previously used as collateral. They wanted cash. But the crunch prevented selling the securities. Cash was tough to get. As Sentinel turned increasingly to its line of credit for cash, the bank’s thirst for the highest-rated, most-liquid securities to secure the loan intensified.
On June 1, a counterparty returned $100 million in physical securities; the bank loan jumped from $259.7 million the day before to $353 million. To meet the bank’s demands for collateral, Sentinel moved about $88 million in government securities from segregated accounts to the lienable account. There was no way to maintain segregation levels via the returned physical securities because Sentinel didn’t keep segregated accounts for physical securities. Sentinel’s segregation deficit grew to $644 million. On June 13, a managing director at the bank emailed various bank officials involved with the Sentinel account, asking how Sentinel had “so much collateral? With less than $20MM in capital I have to assume most of this collateral is for somebody else’s benefit. Do we really have rights on the whole $300MM? ?”[1] After speaking to several bank officers, a client executive responded, “We have a clearing agreement which gives us a full lien on the box position outlined below.” The client executive testified that this was a well-advised and carefully worded statement but both the managing director and the client executive knew Sentinel had an agreement that gave the bank a lien on any securities in clearing accounts. Grede, 441 B.R. at 889-90. Then on June 26, a counterparty returned $166 million in physical securities. The bank loan balance grew to $497.5 million. For collateral, Sentinel moved $66.6 million in government securities out of segregated accounts and into the lienable account. But that wasn’t enough for the bank, so - Sentinel pledged $165 million in physical securities. The segregation deficiency grew to $667 million. On June 27, Sentinel’s loan balanced peaked at $573 million. Two days later, the bank told Sentinel it would no longer accept physical securities as collateral. That day, Sentinel transferred $166 million in corporate securities from segregated accounts to the lienable account. Sentinel’s under-segregation problem grew to $813 million.
A similar transaction occurred on July 17, with a counterparty returning about $150 million in corporate securities. Sentinel transferred $84 million in corporate securities from a segregated account to a lienable account. The bank loan settled at $496.9 million and Sentinel’s segregation shortfall grew to $935 million. At the month’s end, Sentinel briefly sent capital in the other direction. On July 30, Sentinel moved $248 million in corporate securities back into segregation from a lienable account and on July 31, $263 million in government securities back into segregation from a lienable account. Yet that same day, Sentinel moved $289 million in corporate securities from a segregated ac *861 count to a lienable account. Sentinel’s loan settled at $356 million and its segregation deficit at $700 million.
Sentinel couldn’t hang on and told customers on August 13 that it was halting redemptions because of problems in the credit markets. After Sentinel told the bank about this decision the next day, the bank cut its remote access to its systems, sent its officials to Sentinel’s offices, demanded full repayment of the loan, and threatened to liquidate the collateral. Sentinel filed for bankruptcy on August 17, owing the bank $312,247,000.
Plaintiff Frederick J. Grede was appointed Chapter 11 Trustee for Sentinel’s estate and subsequent to the Chapter 11 plan’s confirmation, the trustee of the Sentinel Liquidation Trust. The bank filed a $312 million claim as the only secured creditor. Grede filed an adversary proceeding against the bank alleging that Sentinel fraudulently used customer assets to finance the loan to cover its house trading activity and that the bank knew about it and acted inequitably and unlawfully. Grede brought claims of fraudulent transfer under the bankruptcy code and state law, 11 U.S.C. §§ 544(b)(1), 548(a)(1)(A); 740 ILCS 160/5(a)(l), and preferential transfer, 11 U.S.C. § 547(b), all to avoid the bank’s lien, see 11 U.S.C. § 550(a). Grede also brought claims of equitable subordination of the bank’s claim, 11 U.S.C. § 510(c), and invalidation of the bank’s lien, 11 U.S.C. § 506(d), among others. The district court dismissed the lien invalidation count on the pleadings, Grede v. Bank of New York, No. 08 C 2582, 2009 WL 188460, at *8 (N.D.Ill. Jan. 27, 2009), and the bank moved for summary judgment on the other claims. The court reserved ruling on the bank’s motion and held a bench trial that lasted seventeen days. After hearing from more than a dozen witnesses, listening to audio recordings between bank and Sentinel officials, and reviewing hundreds of exhibits, the district court ruled in the bank’s favor on the remaining counts. The court found that Grede “failed to prove that Sentinel made the Transfers with the actual intent to hinder, delay or defraud its creditors.” Grede, 441 B.R. at 881. The court rejected the equitable subordination claim because the bank’s conduct was not “egregious or conscience shocking” but was at worst negligent. Id. at 901. The court also rejected the preference claim because the bank was over-collateralized on the transfer dates. Id. at 886.
II. Analysis
The crux of this appeal is whether the district court clearly erred in finding that Grede failed to prove (1) that Sentinel acted with actual intent to hinder, delay, or defraud and (2) that the bank engaged in inequitable conduct. We must also determine whether Sentinel’s contracts with the bank violated the law and' thus allow for the bank lien’s invalidation.
A. Fraudulent Transfer
11 U.S.C. § 548(a)(1)(A) allows the avoidance of any transfer of an interest in the debtor’s property if the debtor made the transfer “with actual intent to hinder, delay, or defraud” another creditor. Grede claims that the transfers of customer assets out of segregation and into the lienable accounts in June and July 2007 constituted fraudulent transfers under 11 U.S.C. §§ 548(a)(1)(A) & 544(b), and should thus be avoided.
Grede’s burden at trial was to prove that Sentinel made the transfers with a specific intent of preventing its creditors from reaching their assets. To prove actual fraudulent intent, as opposed to constructive fraud, see 11 U.S.C. § 548(a)(1)(B), Grede had to show that “the main or only purpose of the transfer was to prevent a *862 lawful creditor from collecting a debt.” King v. Ionization Int’l, Inc., 825 F.2d 1180, 1186 (7th Cir.1987); see also In re Jeffrey Bigelow Design Grp., 956 F.2d 479, 484 (4th Cir.1992) (noting that “actual fraudulent intent requires a subjective evaluation of the debtor’s motive”); 5 Collier on Bankruptcy ¶ 548.04[1][a] (16th ed.2012) (trustee must show “intent to interfere with creditors’ normal collection processes or with other affiliated creditor rights for personal or malign ends”). Given the lack of direct proof of actual fraudulent intent, Grede could have tried to prove fraudulent intent indirectly through what have become known as “badges of fraud.” See Frierdich v. Mottaz, 294 F.3d 864, 870 (7th Cir.2002) (listing eight badges); 740 ILCS 160/5(b) (listing eleven). But the district court found that Grede only presented evidence of “at most” a single badge — Sentinel’s insolvency at the time of the transfers. Grede, 441 B.R. at 881-82. Grede’s point about the badges not being the be-all and end-all of proving fraudulent intent with circumstantial evidence is well founded, Brandon v. Anesthesia & Pain Mgmt. Assocs., 419 F.3d 594, 599-600 (7th Cir.2005) (dubbing “badges of fraud” an unfortunate legal cliché that “can exercise a mesmerizing force on lawyers and judges”), but that does not mean his evidence was enough to prove that Sentinel transferred customer assets out of segregation with actual intent to hinder, delay, or defraud, see In re Model Imperial, Inc., 250 B.R. 776, 792 (Bankr.S.D.Fla.2000) (confluence of factors mandated conclusive presumption of fraudulent intent).
Grede maintains that the district court erred as a matter of law because the transfers violated federal law requiring Sentinel to maintain segregation. See Scholes v. Lehmann, 56 F.3d 750, 759 (7th Cir.1995) (even strong circumstantial evidence may not be sufficient to declare that as a matter of law there was fraud in fact). Grede argues that by moving the securities out of segregation and into lienable accounts to repay Sentinel’s repo counterparties, Sentinel acted with “actual intent to hinder, delay, or defraud” its customers. For support, Grede points to cases like In re Bell & Beckwith as establishing that the transferring of a third party’s assets for unauthorized purposes supplies the necessary intent to hinder, delay, or defraud. 64 B.R. 620, 629 (Bankr.N.D.Ohio 1986).
That Sentinel failed to keep client funds properly segregated is not, on its own, sufficient to rule as a matter of law that Sentinel acted “with actual intent to hinder, delay, or defraud” its customers. In Bell & Beckwith, the defendants admitted the transfers were made with intent to defraud, and the court found that the use of customer funds for personal purposes “was an unlawful theft” based on the transferor’s deposition testimony and criminal conviction. Id. As demonstrated in Bell & Beckwith, proving actual fraud as a matter of law requires more than simply showing that the transfers resulted in an under-segregation of client funds. The use of customer assets as collateral for a loan that served purposes that did not directly benefit the customers does not necessarily mean Sentinel had the requisite actual intent to hinder, delay, or defraud the customers. See B.E.L.T., Inc. v. Wachovia Corp., 403 F.3d 474, 478 (7th Cir.2005) (finding no state cases where payments to arms’ length third-party creditors were found fraudulent). Sentinel’s preference of one set of creditors (the bank, whose funds paid off the repo counterparties) over another (its customers) is properly reserved for Grede’s preferential transfer claims, cf. Boston Trading Grp. v. Burnazos, 835 F.2d 1504, 1508-09 (1st Cir.1987) (fraudulent conveyance law exists “for very different purposes” that does not include attempts “to choose among” creditors as contrasted with restitution *863 and preferences), and for reasons not on appeal, the district court rejected Sentinel’s preferential transfer claims, see generally Dean v. Davis, 242 U.S. 438, 444-45, 37 S.Ct. 130, 61 L.Ed. 419 (1917) (knowledge that a transfer is a preference may be sufficient to prove fraud depending on the case’s facts); In re Sharp Int’l Corp., 403 F.3d 43, 56 (2d Cir.2005) (“The $12.25 million payment was at most a preference between creditors and did not ‘hinder, delay, or defraud either present or future creditors.’ ”).
As the district court found, Sentinel made the transfers to pay off one set of creditors in an attempt to save the enterprise from sinking. Grede, 441 B.R. at 884. A debtor’s “genuine belief that” he could repay all his debts if only he could “weather a financial storm” won’t “clothe him with a privilege to build up obstructions” against his creditors, Shapiro v. Wilgus, 287 U.S. 348, 354, 53 S.Ct. 142, 77 L.Ed. 355 (1932), but that does not mean that actions taken to survive a financial storm require a legal finding that the debt- or intended to hinder, delay, or defraud, see Boston Trading Grp., 835 F.2d at 1511 (basic function of fraudulent conveyance law is “to see that an insolvent debtor’s limited funds are used to pay some worthy creditor” as opposed to “determining which creditor is the more worthy”). That Sentinel used client funds as collateral to finance proprietary trading is quite troubling, but the trouble has less to do with any actual intent by Sentinel to “hinder, delay, or defraud” in making those summer 2007 transfers than with Sentinel’s ability to effectively intermingle house and client investments via collateral securing a bank loan that served ambiguous purposes. Cf. Dean, 242 U.S. at 444, 37 S.Ct. 130 (“Making a mortgage to secure an advance with which the insolvent debtor intends to pay a pre-existing debt does not necessarily imply an intent to hinder, delay, or defraud creditors.”). Such an arrangement raises questions of sound financial policy and good business practices, but even if suspect legally, but see infra Part II.C, Sentinel’s transfers within the account structure at the bank doesn’t alone require a finding that Sentinel intended to hinder, delay, or defraud its customers.
 Grede asks that we establish and apply a modified version of the “Ponzi Presumption,” which some courts have used in cases where the debtor knows at the time of the transfer, based on the structure of their scheme, that the scheme would collapse. In re World Vision Entm’t, Inc., 275 B.R. 641, 656 (Bankr.M.D.Fla.2002) (payments made to further a Ponzi scheme are “made with the actual intent to hinder, delay, or defraud creditors” because Ponzi schemes are “by definition fraudulent” and “any acts taken in furtherance of the Ponzi scheme, such as paying brokers commissions, are also fraudulent”); In re Indep. Clearing House Co., 77 B.R. 843, 860 (D.Utah 1987) (because Ponzi scheme operator “must know all along, from the very nature of his activities, that investors at the end of the line will lose their money” and “[k]nowledge to a substantial certainty constitutes intent in the eyes of the law,” knowing “that future investors will not be paid is sufficient to establish his actual intent to defraud them”). Courts infer intent when a debtor participates in a Ponzi scheme. In re C.F. Foods, L.P., 280 B.R. 103, 110 (Bankr.E.D.Pa.2002) (inferring intent when a debtor participated in Ponzi scheme); In re Randy, 189 B.R. 425, 438-39 (Bankr.N.D.Ill.1995) (Ponzi operator “necessarily knew all along that most investors, certainly the latest among them, would lose their money if they invested in his scheme”). Grede doesn’t suggest Sentinel ran a Ponzi scheme but asks us to apply a fraud presumption on the basis that Sentinel must have somehow known that the summer *864 2007 transfers would prevent its investors from getting their money back. See In re Bayou Grp., LLC, 439 B.R. 284, 306-07 (S.D.N.Y.2010) (even in the absence of a Ponzi scheme, prima facie case of actual fraudulent conveyance established by guilty pleas, expert report, and multiple badges of fraud including fraudulently inflated reports).
Yet the district court found that Grede failed to prove that Sentinel knew at the time of the transfers that its scheme would ultimately collapse. Grede’s position would extend the Ponzi Presumption to any case where a debtor somehow acted wrongly in a manner that harmed one set of creditors. Grede cites no authority for such a proposition and because he doesn’t show where the district court clearly erred in finding that he failed to prove that Sentinel officials necessarily knew, or should have known, that their scheme would eventually collapse, Grede, 441 B.R. at 882, we won’t consider whether the Ponzi Presumption may extend beyond cases involving its namesake.
B. Equitable Subordination
Courts will subordinate a claim under 11 U.S.C. § 510(c) when the claimant engaged in inequitable conduct that injured other creditors or conferred an unfair advantage on the claimant, but not when subordination is inconsistent with the Bankruptcy Code. See In re Kreisler, 546 F.3d 863, 866 (7th Cir.2008) (quoting United States v. Noland, 517 U.S. 535, 538-39, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996)). “Equitable subordination allows the bankruptcy court to reprioritize a claim if it determines that the claimant is guilty of misconduct that injures other creditors or confers an unfair advantage on the claimant.” Id. (citing In re Lifschultz Fast Freight, 132 F.3d 339, 343 (7th Cir.1997)). Our only issue is whether the bank engaged in sufficiently inequitable conduct.
Equitable subordination typically involves insiders of closely-held corporations. Lifschultz, 132 F.3d at 343. The corporate insiders, often shareholders, want to convert their low priority claims (equity) into higher priority claims (secured debt). There’s nothing inherently wrong with this, but it muddies relationships and creates opportunities for self-dealing. See id. at 343-44. Courts must tread carefully because wrongfully disregarding a bona fide transaction causes two problems: the upsetting of a- claimant’s legitimate expectations and the spawning of legal uncertainty that courts will refuse to honor otherwise binding agreements “on amorphous grounds of equity,” increasing everyone’s credit costs. Id. at 347. “Equitable subordination means that a court has chosen to disregard an otherwise legally valid transaction.” Id. Courts also apply equitable subordination quite carefully because the question “whether a party has acted opportunistically,” is quite subjective. Id. at 349 (quoting David A. Skeel, Jr., Markets, Courts, and the Brave New World of Bankruptcy Theory, 1993 Wis.L.Rev. 465, 506). There are no clear rules for determining whether underhanded behavior occurred. Id. (“Equitable subordination relies on courts’ peering behind the veil of formally unimpeachable legal arrangements to detect the economic reality beneath.”). Conduct deemed “inequitable” typically falls within three areas: “(1) fraud, illegality, breach of fiduciary duties; (2) undercapitalization; and (3) claimant’s use of the debtor as a mere instrumentality or alter ego.” Id. at 345 (quoting In re Missionary Baptist Found, of Am., 712 F.2d 206, 212 (5th Cir.1983)). Yet mere undercapitalization is not enough; there must be something extra. Id. at 345. See also In re Bowman Hardware & Elec. Co., 67 F.2d 792, 794 (7th Cir.1933) (requiring “act involving moral turpitude or some breach of duty or some *865 misrepresentation whereby other creditors were deceived to their damage”).
Grede’s principal argument is that the district court erred by applying a subjective-intent standard. Under Grede’s standard, the bank’s acceptance of customer assets as collateral for Sentinel’s loan constituted inequitable conduct because the bank knew about Sentinel’s segregation duty and that Sentinel could not use customer assets as collateral. Grede maintains that the bank’s acceptance of collateral that should have remained in segregation violated the Commodity Exchange Act, 7 U.S.C. § 6d(b) (prohibiting depository institutions from treating customer assets “as belonging to the depositing futures commission merchant or any person other than the customers of such futures commission merchant”), and common law duties, see Lerner v. Fleet Bank, N.A, 459 F.3d 273, 287 (2d Cir.2006) (banks may be liable under state law for participating in diversions “either by itself acquiring a benefit, or by notice or knowledge that a diversion is intended or being executed”) (quoting In re Knox, 64 N.Y.2d 434, 488 N.Y.S.2d 146, 477 N.E.2d 448, 451 (1985)). For support of its subjective-intent standard, Grede cites our adoption of the “magisterial Mobile Steel ” decision in Lifschultz, 132 F.3d at 344 (citing In re Mobile Steel Co., 563 F.2d 692, 701 (5th Cir.1977)), but Grede misreads these cases. Both courts applied the “reasonably prudent men” standard to determine whether the debtor was reasonably capitalized, not the degree of egregiousness. See Mobile Steel, 563 F.2d at 702-03; Lifschultz, 132 F.3d at 351-52.
Grede fails to show where the district court clearly erred in finding that the bank did not engage in the type of misconduct that warrants equitable subordination. We emphasize that given that the bank was not an insider, Grede needed evidence of “gross and egregious conduct” such as fraud, spoliation, or overreaching on the bank’s part. See In re First Alliance Mortg. Co., 471 F.3d 977, 1006 (9th Cir. 2006); see also Kham & Nate’s Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351, 1356 (7th Cir.1990) (few cases subordinate “claims of creditors that dealt at arm’s length”); 4 Collier on Bankruptcy ¶ 510.05[4] (16th ed.2012) (citing cases). Based on the evidence presented at trial, including hours of recorded phone calls involving bank and Sentinel employees, the district court found that the bank and Sentinel had a typical ten-year relationship that only came into trouble in the summer of 2007. Grede, 441 B.R. at 891. Sentinel assured the bank that it could use customer securities as collateral and that its customers knew about Sentinel’s leveraged trading strategy. Id. The bank could not see collateral moving to and from segregated accounts and there was no particular reason for the bank to see or track each transfer. Id. The bank also lacked any real motivation to lend millions of dollars simply to earn extra overnight interest. Id. at 891-92. At worst, bank officials acted negligently, but not fraudulently. Id. at 894, 898, 901. The district court’s finding that the bank officials were suspicious, as exemplified by the email change between bank officials over how Sentinel was able to pledge $300 million in collateral with only $2 million in capital, doesn’t require a finding that the bank’s conduct was sufficiently egregious. Id. at 890-92. Perhaps the bank should have known that Sentinel violated segregation requirements, but as the district court found, “such a lack of care does not rise to the level of the egregious misconduct necessary for equitable subordination.” Id. at 891. And as detestable as the bank officials’ testimony may appear, we are not going to question the district court’s able credibility judgments, Gaffney, 451 F.3d at *866 448, particularly where the court took account of the problematic aspects of the testimony, and explained that while it did not always believe the bank officials, the discredited testimony did not lead the court to believe the witnesses were covering up knowledge of Sentinel’s “pre-collapse mess.” Grede, 441 B.R. at 893-94 (“Lies are sometimes told, as they were here, not to help the employer in a lawsuit, but rather to help the employee’s career.”). Instead of finding that their testimony justified a finding of egregious bank behavior, the district court essentially found that the bank officials were such artless liars that they couldn’t have been concealing deliberate wrongdoing. Instead, the bank officials were simply trying to cover up their own incompetence. Id. at 893. And incompetence alone, however problematic, won’t require the equitable subordination of the bank’s lien.
Grede seeks to retroactively impose a requirement for the bank to ensure Sentinel maintained appropriate segregation levels and argues that its failure to do so justifies a finding of inequitable conduct. For support, Grede cites a CFTC letter that prohibits pledging of customer securities for debts regardless of location. Even if we accepted the letter as authoritative, the bank’s failure to somehow ensure segregation compliance would not support the required level of egregious behavior. Grede doesn’t explain how the bank was suppose to access Sentinel’s moment-by-moment segregation calculations, its segregated accounts at other banks, or even how to evaluate the fluctuating market value of the segregated assets. The bank would also have to know how much was on deposit from Sentinel’s FMC customers as opposed to its non-FCM customers such as hedge funds. Even the CFTC in its amicus brief acknowledges that there is an absence of direct authority for its position that the district court misinterpreted 7 U.S.C. § 6d(b) in finding that the bank did not violate legal duties. See Br. of CFTC as Amici Curiae Supporting Appellant at 13-14 n. 12. A violation of an issue of first impression, even if the CFTC is correct, does not supply the required degree of egregious conduct needed for equitable subordination.
C. Voiding the Contract
The district court dismissed under Rule 12(b)(6) the claim that Sentinel’s contracts with the bank were inherently illegal. See 11 U.S.C. § 506(d) (voiding liens securing disallowed claims). We review de novo. Tamayo v. Blagojevich, 526 F.3d 1074, 1081 (7th Cir.2008).
The district court correctly dismissed this claim because although the agreements may have created a structure for abuse, the agreements were not the cause of Sentinel’s under-segregation. A contract may be found unenforceable in situations where the conduct required in the contract violates the law, see U.S. Nursing Corp. v. Saint Joseph Med. Ctr., 39 F.3d 790, 792 (7th Cir.1994) (Illinois law), but Grede fails to point to any provision in the contract that required Sentinel or the bank to do anything even remotely illegal, see N. Ind. Pub. Serv. Co. v. Carbon Cnty. Coal Co., 799 F.2d 265, 273 (7th Cir.1986) (illegality defense does not apply when a party merely “commits unlawful acts to carry out his part of the bargain”). The contract’s provision requiring Sentinel to release all third party claims when the funds were desegregated was not inherently unlawful because segregated funds could be deposited elsewhere “in the normal course of business” to settle trades. 7 U.S.C. § 6d(a)(2); see also 17 C.F.R. § 1.23 (stating that § 6d(a)(2) does not prohibit entities withdrawing segregated funds “to the extent of its actual interest”); 17 C.F.R. § 1.29 (FCMs may receive and retain funds “as its own any increment or *867 interest resulting” from investments). Even if the contract’s terms enabled illegal activity, the provision did not inherently cause segregation violations. Quite unlike in Cary Oil Co. v. MG Ref. & Mktg., Inc., 230 F.Supp.2d 439, 452 (S.D.N.Y.2002), Grede did not allege that Sentinel and the bank promised “to do something unlawful.”
III. Conclusion
We Affirm the judgments of the district court.

. The official was actually referencing Sentinel's $2 million in capital, even though he seemed to think Sentinel had ten times that amount. He was closer in referring to the bank’s $300 million in collateral, which at that point apparently reached $302 million.